Slip Op. 12-33

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

PT PINDO DELI PULP and PAPER MILLS,

                Plaintiff,

    v.

UNITED STATES,

              Defendant,
     and

APPLETON COATED LLC, NEWPAGE CORPORATION, S.D. WARREN COMPANY d/b/a SAPPI FINE PAPER NORTH AMERICA, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,

            Intervenor Defendants.

</td><td>

Before: Jane A. Restani, Judge

Court No. 10-00369

</td></tr>
</table>

## OPINION

[Plaintiff-Respondent PT Pindo Deli Pulp and Paper Mills' motion for judgment on the agency record in antidumping duty order scope matter denied.]

Dated: March 16, 2012

Daniel L. Porter and James P. Durling, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for plaintiff. With them on the brief were Matthew P. McCullough and Ross E. Bidlingmaier.

Alexander V. Sverdlov, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was David Richardson, International Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of

Washington, DC.

   William A. Fennell, Stewart and Stewart, of Washington, DC, and Gilbert B. Kaplan, King & Spalding, LLP, of Washington DC, argued for intervenor defendants. With them on the brief were Jeffrey M. Telep, Eric P. Salonen, and Terence P. Stewart, Stewart and Stewart, of Washington, DC, and Brian E. McGill, Christopher T. Cloutier, and Daniel L. Schneiderman, King & Spalding, LLP, of Washington, DC.

   Restani, Judge:  This matter is before the court pursuant to Plaintiff-Respondent PT Pindo Deli Pulp and Paper Mills' ("Pindo Deli" or "Plaintiff") 56.2 motion for judgment on the agency record.  Plaintiff challenges the final antidumping duty determination[1] of the Department of Commerce, International Trade Administration ("Commerce" or "ITA") in Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From Indonesia: Final Determination of Sales at Less Than Fair Value, 75 Fed. Reg. 59,223 (Dep't Commerce Sept. 27, 2010).[2]  Pindo Deli argues Commerce improperly expanded the scope of the investigation to include multi-ply paperboard for packaging applications.  Resp't Pl.'s Mem. of Points and Authorities in Support of its Mot. for J. on the Agency R. 1 ("Pl.'s Br.").  Pindo Deli argues that even if Commerce did not improperly expand the scope, Commerce's final determination is contrary to law because it rests on inadequate industry support.  Id. at 2.

---

  [1] For a summary description of the antidumping duty determination process see Sioux Honey Ass'n v. Hartford Fire Ins. Co., No. 11-1040, 2012 U.S. App. LEXIS 2399, at *4–9 (Fed. Cir. Feb. 7, 2012).

  [2] In a separate case, Court No. 10-00370, Plaintiff Pindo Deli brought a 56.2 motion challenging the scope of the countervailing duty investigation for certain coated paper from Indonesia in Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination, 75 Fed. Reg. 59,209 (Dep't Commerce Sept. 27, 2010).  Because the agency record, final orders, and briefing addresses the same scope, the court addresses Plaintiff's arguments relating to the countervailing duty and antidumping duty investigations in a single opinion.

Ultimately, the court rejects both of Pindo Deli's arguments.

## BACKGROUND

Because Commerce's reasoning is found in several documents, the administrative

proceedings are described in detail.  In September 2009, NewPage Corp., Appleton Coated LLC,

S.D. Warren Company d/b/a Sappi Fine Paper North America, and the United Steel, Paper and

Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International

Union ("USW") (collectively "Petitioners") submitted a petition to Commerce requesting

antidumping and countervailing duties be imposed on imports of "certain coated paper suitable

for high quality print graphics using sheet-fed presses" ("CCP") from Indonesia and the People's

Republic of China.  Petitions for the Imposition of Countervailing and Antidumping Duties on

Imports of Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed

Presses from Indonesia and the People's Republic of China ("Petition") Pl.'s Confidential App.

Tab 4, at 7.[3]

_____

[3] The Petition contained the following proposed scope:

The merchandise covered by each of these investigations includes Certain Coated Paper and paperboard suitable for high quality print graphics using sheet-fed presses, whether in finished sheet form or in semi-finished roll form; coated on one or both sides with kaolin (China or other clay), calcium carbonate, titanium dioxide, and/or other inorganic substances; with or without a binder; having a GE brightness level of 80 or higher; weighing not more than 340 grams per square meter; whether gloss grade, satin grade, matte grade, dull grade, or any other grade of finish; whether or not surface-colored, surface-decorated, printed (except as described below), embossed, or perforated; and irrespective of dimensions ("Certain Coated Paper").

Certain Coated Paper includes coated paper in sheets or in rolls intended to be converted into sheets prior to final printing that meets this scope definition. Certain Coated Paper includes (a) coated free sheet paper that meets this scope definition; (b) coated groundwood paper produced from bleached chemi-thermo-mechanical pulp ("BCTMP") that meets this scope definition; and (c) any other coated paper that meets this scope definition.

Certain Coated Paper is typically (but not exclusively) used for printing multi-colored graphics for catalogues, books, magazines, envelopes, labels and wraps, greeting cards, and other commercial printing applications requiring high quality print graphics.

Specifically excluded from the scope are imports of paper or paperboard printed with final content printed text or graphics.

As of 2009, imports of the subject merchandise are provided for under the following statistical categories of the HTSUS: 4810.13.1100, 4810.13.1900, 4810.13.2010, 4810.13.2090, 4810.13.5000, 4810.13.6000, 4810.13.7000, 4810.14.1100, 4810.14.1900, 4810.14.2010, 4810.14.2090, 4810.14.5000, 4810.14.6000, 4810.14.7000, 4810.19.1100, 4810.19.1900, 4810.19.2010, 4810.19.2090, 4810.22.1000, 4810.22.5000, 4810.22.6000, 4810.22.7000, 4810.29.1000, 4810.29.5000, 4810.29.6000, 4810.29.7000.

While HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of this investigation is dispositive.

Petition at 7–8 (footnote describing the GE brightness scale deleted).

The Petition stated that the like domestic product was CCP but that "all or virtually all" CCP produced in the United States was coated free-sheet paper ("CFS").[4] Id. at 8. Petitioners were unaware of any reasonably available public source that reported U.S. production of CCP or CFS paper and therefore, submitted data on U.S. shipments of CFS paper as a proxy for U.S. production of CCP. Id. at 3. The only known U.S. producers of CCP were the Petitioners, Mohawk Fine Papers, and SMART Papers LLC. Id. at 1. SMART Papers LLC submitted a letter in support of the Petition. Petition, Def.'s Confidential App. Tab 1, at Ex. I–2. Petitioners used the industry data to estimate the share of CFS shipments among the known domestic producers and Petition supporters and concluded Petitioners and supporters constituted more than 50% percent of total U.S. production of CCP in sheets. Id. at Ex. I–4.

Commerce initiated an antidumping duty investigation of CCP from China and Indonesia. Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia and the People's Republic of China: Initiation of Antidumping Duty Investigations, 74 Fed. Reg. 53,710 (Dep't Commerce Oct. 20, 2009) ("Initiation Notice").[5] Commerce concluded Petitioners had the required industry support and adopted the scope definition proposed by the Petition with two modifications. Commerce added a footnote

---

[4] CFS is coated paper with no more than 10% mechanical pulp. See Petition at 6 n.5; see also Pl.'s Br. at 5.

[5] Commerce also initiated a countervailing duty investigation of CCP from Indonesia. Certain Coated Paper from Indonesia: Initiation of Countervailing Duty Investigation, 74 Fed. Reg. 53,707 (Dep't Commerce Oct. 20, 2009). As indicated, the scope of the countervailing and antidumping duty investigations were the same. See id. at 53,710 (defining the scope as CCP paper). Thus, the court's reference to the Initiation Notice refers to the initiation of both investigations.

defining paperboard[6] and excluded CCP in "semi-finished rolls" from the scope of the

investigation.  See Initiation Notice, 74 Fed. Reg. at 53,711, 53,715, at App. I.

　　　　In November 2009, Pindo Deli submitted comments on the proper scope of the

investigation and requested Commerce to confirm that "multi-ply coated paperboard" was not

within the scope of the investigations.  Pindo Deli Scope Cmts. of Nov. 6, 2009 ("Pl.'s Scope

Cmts.") Pl.'s Confidential App. Tab 6, at 2.  Pindo Deli argued multi-ply coated paperboard is

"not suitable for high quality print graphics using sheet-fed presses," because it is "used

primarily for industrial packaging" and has different physical characteristics, manufacturing

processes, and end-uses than singly-ply paperboard.  Id. at 2–3.  Pindo Deli also argued that the

inclusion of multi-ply paper would call into question Petitioner's standing because major

producers of multi-ply paper for packaging applications were not included in the Petition.  Id. at

10–12.

　　　　Petitioners responded that any coated paper or paperboard that meets the product

description should be included in the scope and submitted advertising materials from Pindo Deli

that described Pindo Deli's multi-ply paper as suitable for "[h]igh quality cover applications,

annual reports, catalog covers, trading cards, advertising brochures, and folders."  Pet'rs'

Rebuttal Scope Cmts. of Nov. 16, 2009 ("Pet'rs' Scope Cmts.") Def.'s Confidential App. Tab 5,

at 2, 5.

　　　　In December 2009, Pindo Deli requested that Commerce re-examine the

_____

　　[6]  The added footnote stated: "'Paperboard' refers to Certain Coated Paper that is heavier, thicker and more rigid than coated paper which otherwise meets the product description.  In the context of Certain Coated Paper, paperboard typically is referred to as 'cover,' to distinguish it from 'text.'"  Initiation Notice, 74 Fed. Reg. at 53,715 n.4.

determination of industry support made at the time of initiation.  Request to Re-examine the

Dep't's Industry Support Calculation, Pl.'s Confidential App. Tab 7.  Pindo Deli argued that

because the scope had been expanded to include multi-ply paperboard for packaging

applications, Commerce must recalculate industry support.  Id. at 7.  In support of its argument,

Pindo Deli included information from U.S. producers not included in the Petition that advertised

coated paper meeting the weight and brightness levels indicated in the scope.  Id. at Attachs.

Petitioners responded that it had never changed the scope definition or misled Commerce, the

scope had never been conditioned on the number of plies, and if Pindo Deli wanted a

determination on whether a particular product was within the scope, Pindo Deli should use a

scope inquiry and not frame the argument as a standing issue.  Pet'rs' Resp. to Chinese and

Indonesian Resp'ts Req. to Re-examine Dep't's Industry Support Calculation, Def.'s

Confidential App. Tab 7, at 8–10.

       In February 2010, during meetings with the parties regarding scope issues,

Commerce expressed concern over the administrability of the phrase "suitable for high quality

print graphics" and requested comments on whether the suitability phrase could be deleted from

the scope definition.  Certain Coated Paper from Indonesia: Preliminary Affirmative

Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination

with Final Antidumping Duty Determination, 75 Fed. Reg. 10,761, 10,763 (Dep't Commerce

Mar. 9, 2010) ("CVD Preliminary Determination").[7]  Pindo Deli argued the suitability phrase

could not be deleted without improperly expanding the scope to include products not originally

covered by the Petition, such as multi-ply paperboard for packaging applications.  Pl.'s

Additional Scope Cmts. of March 29, 2010 ("Pl.'s Add. Scope Cmts.") Pl.'s Confidential App.

Tab 9, at 2.

   In May 2010, Petitioners responded to a Commerce questionnaire on scope issues

and explained that the Petition did not include the U.S. producers identified by Pindo Deli

because Petitioners were not experts in the packaging industry and were not aware that the U.S.

packaging industry also produced CCP paper.  Pet'rs' Resp. to Supplemental Questionnaire

("Pet'rs' Questionnaire Resp.") Def.'s Confidential App. Tab 9, at 7.  Petitioners argued their

omission was irrelevant because the U.S. producers identified by Plaintiff have workers

represented by USW, one of the Petitioners, and therefore, supported the Petition.  Id. at 7–8.

   In August 2010, Commerce issued an internal memorandum addressing the scope

comments.  Antidumping and Countervailing Duty Investigations: Certain Coated Paper Suitable

for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia and the People's

Republic of China, Scope ("Scope Memo"), Def.'s Confidential App. Tab 17.  The Scope Memo

concluded that multi-ply products were within the scope of the investigation and rejected

--------

  [7]  In May 2010, Commerce published its preliminary determination in the antidumping
duty determination.  See Certain Coated Paper Suitable for High-Quality Print Graphics Using
Sheet-Fed Presses from Indonesia: Preliminary Determination of Sales at Less Than Fair Value
and Postponement of Final Determination, 75 Fed. Reg. 24,885 (Dep't Commerce May 6, 2010)
("ADD Preliminary Determination").  The ADD Preliminary Determination repeated
Commerce's conclusion contained in the CVD Preliminary Determination that the number of
plies was not a relevant physical characteristic.  Id. at 24,887.

Plaintiff's argument that the physical characteristics of multi-ply paperboard made it unsuitable

for high quality print graphics because Plaintiff's own sales publications demonstrated that some

multi-ply products were suitable for high quality printing. Id. at 3–6. The Scope Memo noted

that Commerce was prohibited from reconsidering industry support after initiation but added that

the inclusion of multi-ply products did not expand the scope. Id. at 7.[8]

　　　　　The Scope Memo concluded that the phrase "suitable for high quality print

graphics" could not be deleted from the scope definition because deleting the phrase would

improperly expand the scope of the investigation to include products that met the physical

description of the scope but were not subject merchandise because they were not suitable for

high quality print graphics. Id. at 10–11 ("[T]he possibility that we would be bringing into the

scope merchandise that is not 'suitable for high quality print graphics' especially in the

packaging applications leads us to recommend that the phrase not be deleted."). Commerce also

noted the lack of objective physical criteria defining the phrase and stated that given the late

stage of the investigation, the Department likely could not adequately determine whether specific

products were in or out of the scope, but could do so in the context of a scope inquiry after the

issuance of final orders. Id. at 11. Pindo Deli submitted a brief challenging Commerce's

determination of the scope and Petitioners responded with a rebuttal brief. Pl.'s Case Br.

Concerning Scope Issues of APP-China and APP-Indonesia, Pl.'s Confidential App. Tab 11;

Resp.'s Case Br. Concerning Scope Issues of APP-China and APP-Indonesia, Def.'s

---

[8] The Scope Memo also granted Petitioners' request to include the Harmonized Tariff System of the United States ("HTSUS") classifications not originally included in the Petition but which may be applicable to some multi-ply subject merchandise. Scope Memo at 11–12.

Confidential App. Tab 19.

In September 2010, Commerce published its final antidumping and countervailing

determinations. Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed

Presses from Indonesia: Final Determination of Sales at Less Than Fair Value, 75 Fed. Reg.

59,223 (Dep't Commerce Sept. 27, 2010) ("ADD Final Determination"); Certain Coated Paper

Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final

Affirmative Countervailing Duty Determination, 75 Fed. Reg. 59,209 (Dep't Commerce Sept.

27, 2010) ("CVD Final Determination"). The final determinations adopted the same scope

language as the Initiation Notice. ADD Final Determination, 75 Fed. Reg. at 59,224; CVD Final

Determination, 75 Fed. Reg. at 59,210. The final determinations concluded: (1) multi-ply coated

paper and paperboard are not excluded from the scope of the investigations; (2) the phrase

"suitable for high-quality print graphics" should be maintained; and (3) the three HTSUS

classifications not mentioned in the Petition that may include multi-ply paperboard should be

added to the scope as a reference. ADD Final Determination, 75 Fed. Reg. at 59,225; CVD Final

Determination, 75 Fed. Reg. at 59,210. Although there were multiple Issues and Decision

Memoranda relating to the investigations, all scope issues for all investigations were addressed

in Issues and Decision Mem. for the Final Determination in the Countervailing Duty

Investigation of Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed

Presses from the People's Republic of China, C-570-959, POR 1/1/2008-12/31/2008 (Sept. 20,

2010) ("Issue and Decision Memorandum"), available at

http://ia.ita.doc.gov/frn/summary/prc/2010-24184-1.pdf (last visited Mar. 16, 2012).[9]

      The Issue and Decision Memorandum noted that Pindo Deli had not addressed the evidence on the record showing that certain Pindo Deli paper met the physical description of the scope and was advertised as suitable for high quality printing. Id. at 50. Commerce noted that the Scope Memo concluded that the parties had not provided an objective definition of the phrase "suitable for high quality print graphics" but that this did not mean Commerce did not know what the phrase meant.[10] Id. Commerce noted that the Scope Memo had concluded that the phrase limited the scope of the investigation beyond the physical characteristics included in the scope definition and therefore, had meaning. Id. Commerce also noted that the use of a scope inquiry to determine whether a product is within the scope of an order is a normal and anticipated procedure specified in the regulations. Id. at 50–51. The Issue and Decision Memorandum found that the Petition intended to include multi-ply paperboard, the physical characteristics and end-use applications of multi-ply paperboard do not distinguish it from subject merchandise, and the suitability phrase should be maintained. Id. at 51–58. Commerce also found there was insufficient evidence to find that Petitioners had made an intentional or

_____

[9] "The briefs pertaining to scope issues were submitted on the records of all four concurrent antidumping and countervailing duty investigations of certain coated paper from Indonesia and the People's Republic of China, and are addressed in the 'Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China,' dated concurrently with this memorandum." Issues and Decision Memorandum for Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination, at 3, C-560-824, Investigation (Sept. 20, 2010), available at http://ia.ita.doc.gov/frn/summary/indonesia/2010-24182-1.pdf (last visited Mar. 16, 2012).

[10] Among other things, objective criteria make it easier for Customs to process entries.

material omission of domestic producers and concluded that because the scope had not been

expanded, there was no reason to reevaluate standing.  Id. at 59.

Commerce published an antidumping duty order and countervailing duty order in

November 2010.  Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-

Fed Presses from Indonesia: Antidumping Duty Order, 75 Fed. Reg. 70,205 (Dep't Commerce

Nov. 17, 2010); Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet Fed-

Presses from Indonesia: Countervailing Duty Order, 75 Fed. Reg. 70,206 (Dep't Commerce Nov.

17, 2010).

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will uphold

a final antidumping duty or countervailing duty determination unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. §

1516a(b)(1)(B)(i).

## DISCUSSION

**I.    Scope of the Investigations**

"Commerce retains broad discretion to define and clarify the scope of an

antidumping investigation in a manner which reflects the intent of the petition."  Minebea Co. v.

United States, 16 CIT 20, 22, 782 F. Supp. 117, 120 (1992), aff'd 984 F.2d 1178  (Fed. Cir.

1993).  Commerce must exercise its discretion "reasonably and any consequent determination

must be supported by substantial evidence in the administrative record."  782 F. Supp. at 120

(citations omitted).

Here, Pindo Deli argues that Commerce erred in interpreting the intent of the

Petition in two ways. First, Commerce's conclusion that the Petition intended to cover all paper

and paperboard, regardless of the number of plies, is not supported by substantial evidence. Pl.'s

Br. at 15. Second, Commerce's conclusion that some multi-ply paperboard products are

"suitable for high quality print graphics" is not supported by substantial evidence.[11] Id. at 23–27.

The court addresses each argument in turn.

    A.    **Exclusion of Multi-Ply Products**

        In making its determination, Commerce first looked to the intent of the Petition

and the Petitioner's proposed scope. See CVD Preliminary Determination, 75 Fed. Reg. at

10,762–63. The scope definition, as contained in the Petition and adopted in the Initiation

Notice, does not refer to the number of plies. See Initiation Notice, 74 Fed. Reg. at 53,715.

Instead, the Initiation Notice described the scope as including: "(a) coated free sheet paper and

paperboard that meets this scope definition; (b) coated groundwood paper and paperboard

---

    [11] Pindo Deli occasionally frames its argument differently and argues Commerce erred by (1) including multi-ply products for packaging applications within the scope and, (2) concluding multi-ply products for packaging applications are suitable for high quality graphics. See Pl.'s Br. at i. The record does not show that Commerce ever concluded that all multi-ply products for packaging applications were properly within the scope of the investigation. Instead, Commerce concluded that multi-ply products should not be excluded from the scope because some multi-ply products meet the scope definition and are suitable for high quality graphics. Commerce stated: "While we are not excluding multi-ply, we do not rule out the possibility that certain merchandise (and, in particular, certain paper for packaging applications) that meets the physical characteristics described in the scope, may nonetheless be non-subject merchandise because it is not suitable for high-quality print graphics." Issue and Decision Memorandum at 51. Thus, Commerce recognized that not all multi-ply paperboard would be included within the scope of subsequent orders. Commerce could not, however, draw a clear dividing line between subject multi-ply paperboard and non-subject multi-ply paperboard because the parties had not presented sufficient evidence on the differences in physical characteristics between the products. See id. Commerce stated the parties would have the opportunity to develop the record in any subsequent scope inquiries should the issue arise. Id.

produced from bleached chemi-thermo-mechanical pulp ("BCTMP") that meets this scope

definition; and (c) any other coated paper that meets this scope definition." Id. The applicable

definition is that the product is: (1) paper or paperboard; (2) in sheets; (3) suitable for high

quality print graphics using sheet-fed presses; (3) coated; (4) with a GE brightness of 80 or

higher, and; (5) weighing not more than 340 grams per square meter. Petition at 7. Thus, the

Petition did not distinguish based on the number of plies or make the number of plies a relevant

characteristic in defining the scope. Commerce's interpretation of the Petition to include any

coated paper that otherwise meets the scope's definition (weight, brightness, etc.) and is suitable

for high quality print graphics is therefore, a reasonable interpretation of the Petition's proposed

scope.

   Pindo Deli argues Commerce improperly ignored evidence showing that the

Petitioners never intended to include multi-ply paperboard within the scope of the investigation.

Pl.'s Br. at 19. Specifically, Pindo Deli argues Commerce ignored: (1) the significance of the

word "certain" in the scope's title; (2) the Petition's failure to include significant foreign

producers of multi-ply coated paperboard for packaging applications; (3) the Petition's limitation

of the domestic industry to producers of CFS paper and the exclusion of production data for

domestic producers of paperboard for packaging applications, and; (4) that Petitioners admitted

mechanical coated paper is not suitable for high quality print graphics by stating the lower

amount of mechanical fiber in CFS helps the paper avoid discoloring with age. Pl.'s Br.

at 15–19. Pindo Deli agrees that Commerce addressed its fifth argument, that the HTSUS

classification applicable to multi-ply paper was not included in the Petition, but argues

Commerce improperly interpreted the HTSUS rules.[12]  Pl.'s Br. at 20–23.

Contrary to Plaintiff's assertion, Commerce discussed each of Plaintiff's

arguments.  Issue and Decision Memorandum at 51–55; see also Scope Memo at 8 & n.30

(addressing the same five arguments in deciding whether to delete the phrase "suitable for high

quality print graphics").  The court finds that none of Pindo Deli's arguments distract

significantly from the substantial evidence on the record showing that the Petition intended to

include multi-ply products that otherwise meet the scope definition.  First, there is no evidence

that the word "certain" in the title is meant to exclude multi-ply products.  Second, Petitioners

used U.S. shipments of CFS paper as a proxy for domestic CCP production because Petitioners

believed all or virtually all U.S. production of CCP consisted of CFS paper.  Although the record

now shows that Petitioners may have been wrong that all or virtually all U.S. production is CFS

paper,[13] there is no evidence to suggest Petitioners did not hold their initial understanding

_____

[12]  The HTSUS items included in a petition are for reference only and are not dispositive
of scope.  See Wirth Ltd. v. United States, 22 CIT 285, 295–96, 5 F. Supp. 2d 968, 977–78
(1998), aff'd 185 F.3d 882 (Fed. Cir. 1999) ("The inclusion of various HTSUS headings in a
petition ordinarily should not be interpreted to exclude merchandise determined to be within the
scope of the antidumping or countervailing duty orders but classified under an HTSUS heading
not listed in the petition.").  Thus, whatever HTSUS classification may have been excluded from
the Petition cannot trump the plain language of the scope definition, which did not distinguish
based on the number of plies.

[13]  Petitioners concede that Pindo Deli has provided evidence showing certain U.S.
companies produce paper that meets the scope definition.  See Pet'rs' Questionnaire Resp. at 4,
8–9.  Such evidence does not demonstrate what portion of the total revenue can be attributed to
CCP paper, and thus, the evidence does not show significant production of CCP was excluded
from the Petition.  See infra, § II.  Moreover, Plaintiff has not demonstrated that production
levels for these U.S. producers were readily available to Petitioners, and therefore, should have
been included in the Petition.  See 19 U.S.C. § 1673a(c)(1)(A)(i) (Commerce must determine
whether the petition "contains information reasonably available to the petitioner supporting the
allegations").

sincerely, as Commerce found. Instead, Petitioners explain that they are not experts in the

packaging industry and were not aware that some packaging companies also made CCP paper or

that there were other foreign producers of CCP. Pet'rs' Questionnaire Resp. at 5. Petitioners'

omission of U.S. producers, of which they were not aware, does not evidence an intent to

exclude these products from the investigation. Similarly, the failure to name foreign producers,

of which Petitioners was not aware, does not demonstrate an intent to exclude those producers

from the investigation. Third, the record reflects that Petitioners excluded shipments of coated

mechanical paper from their calculation of industry support because the industry data showed

that U.S. production of mechanical paper is in rolls (not sheets) and therefore, is not included

within the scope of the Petition. See Petition, Todasco Ex. A, at 14 (industry data showing

between 0 and 0.1% of U.S. shipments of coated mechanical paper are in sheets). Finally,

although less mechanical pulp helps paper avoid discoloring with age, and multi-ply products

generally contain more mechanical pulp than single-ply products, it does not follow that all

multi-ply products are therefore categorically incapable of high quality print graphics. See, e.g.,

Pet'rs' Scope Cmts. at 4–5 & Attachs. (noting Plaintiff's own materials advertise its multi-ply

products as suitable for "[h]igh quality cover applications, annual reports, catalog covers, trading

cards, advertising brochures, and folders"). Thus, Plaintiff's evidence does not contradict

Commerce's conclusion that the Petition intended to include multi-ply paper that otherwise

meets the scope definition.

### B.    Suitable for High Quality Print Graphics

Pindo Deli argues the physical characteristics and typical end-uses of multi-ply

paperboard[14] make it unsuitable for high quality printing and that Commerce failed to define the

term "suitable for high quality print graphics." Pl.'s Br. at 23–29.

Pindo Deli argues multi-ply paperboard has a higher amount of mechanical pulp than

single-ply paper, making it difficult to control the accuracy of the printing and resulting in

reduced clarity and print quality.[15] Id. at 25.  The assumption inherent in this argument,

unsupported by the record, is that at some point, the amount of mechanical pulp will render a

multi-ply product unsuitable for high quality print graphics.  It would be unreasonable to

conclude from this argument that any product that includes mechanical pulp is unsuitable for

high quality print graphics.  Plaintiff's arguments only echo Commerce's conclusion that

although some multi-ply products are subject merchandise and some likely are not, the record

does not currently reflect an appropriate dividing line among all such products.

Pindo Deli also argues that multi-ply paper requires recycled waste paper pulp, as

opposed to the virgin pulp principally used in singly-ply paper, and thus, multi-ply paperboard is

---

[14] Pindo Deli uses "multi-ply paperboard" and "multi-ply paperboard for packaging applications" interchangeably.  The record shows that at least some multi-ply products are suitable for high quality graphics and thus, not all "multi-ply paperboard" is "multi-ply paperboard for packaging applications."  See Pet'rs' Scope Cmts. at 4–5 (citing to Pindo Deli sales materials that advertise Plaintiff's multi-ply paperboard as suitable for high quality printing).

[15] Pindo Deli argues Commerce ignored this evidence altogether.  Pl.'s Br. at 10.  As Commerce addressed Plaintiff's arguments in the Issue and Decision Memorandum and in the Scope Memo, this argument lacks merit.  See Issue and Decision Memorandum at 51–59; Scope Memo at 8 n.30.

incapable of high quality print graphics.  Pl.'s Br. at 26.  Again, Pindo Deli's argument points

only to some undefined proportion of recycled waste paper pulp versus virgin pulp that reduces a

product's whiteness and suitability for high quality print graphics.  Plaintiff's evidence does not

demonstrate that all multi-ply products by definition include the proportion of recycled waste

paper necessary to render a product unsuitable for high quality print graphics.  Similarly, Pindo

Deli's argument that multi-ply paperboard is generally used for packaging applications and is

intended to be folded does not demonstrate that all multi-ply paper or paperboard capable of

being folded or used for packaging applications is incapable of high quality print graphics.

   The record evidence relied on by Commerce demonstrates that the number of

plies alone does not render a product unsuitable for high quality print graphics.  For instance,

Plaintiff's own sales merchandise advertises multi-ply coated paper and paperboard with the

necessary GE brightness and weight as suitable for high quality printing.  See Pet'rs' Scope

Cmts. at 4–5 & Attachs.[16]  These sales materials show that two Pindo Deli brands of paper,

Golden Coin and SinarRoyal, are coated paper that meet the requirements for weight and

brightness and are advertised as appropriate for, respectively, "white & color printing and

writing paper" and "[h]igh quality cover applications, annual reports, catalog covers, trading

cards, advertising brochures, and folders."  Id.  Thus, Pindo Deli's own sales merchandise

---

[16]  Pindo Deli argues the fact that its sales materials advertise a product as capable of high
quality printing does not mean the product can actually be used for that purpose because sales
materials merely reflect the manufacturer's aspiration for the product and do not provide a
complete description of the product or its uses.  Pl.'s Br. at 29.  This argument does not appear to
have been made before the agency and thus does not distract from the adequacy of the agency's
conclusion.  See Issue and Decision Memorandum at 50.  Also, equity would not permit the
court to rely on the falsity of a plaintiff's advertising to its benefit.

supports Commerce's conclusion that some multi-ply products are suitable for high quality print

graphics.  Commerce also relied on print tests contained in a verification report in which

investigators concluded that Plaintiff's multi-ply mechanical paper from Indonesia was virtually

indistinguishable from comparable single-ply paper manufactured by Petitioners.  Issue and

Decision Memorandum at 52, 55.  Pindo Deli has not addressed or disputed the verification

report.  Thus, the record shows that at least some multi-ply paper is suitable for high quality print

graphics, including paper produced by Pindo Deli, and Commerce's decision not to exclude all

multi-ply products is supported by substantial evidence.

          Pindo Deli argues that Commerce's conclusion must be in error because

Commerce never defined the term "suitable for high quality print graphics" and thus, could not

determine whether multi-ply products meet this definition.  Pl.'s Br. at 23.  In evaluating whether

the suitability phrase could be deleted from the scope definition, Commerce noted that the

parties had not provided an objective definition of the phrase.  Scope Memo at 4.  Commerce

ultimately concluded however, that the suitability phrase could not be deleted from the scope

definition because it provided a limitation on the scope beyond the physical description.  Scope

Memo at 8–11; Issue and Decision Memorandum at 50.  In the Scope Memo, Commerce stated

that it was unable to determine whether particular products were subject merchandise because

the record lacked information relating to the specific physical characteristics that can distinguish

subject multi-ply merchandise from non-subject multi-ply merchandise.[17]  Scope Memo at 9–10.

Commerce, therefore, did not state that the phrase had no meaning, only that it could not, based

on the record currently before it, make product specific determinations in a vacuum and

proposed that specific determinations be made through scope inquiries should the issue arise.

Issue and Decision Memorandum at 50.  Specifically, Commerce stated it intended to rely on the

scope procedures described in 19 C.F.R. § 351.225 to evaluate products on a case-by-case basis.

Id. at 51.

The regulation referenced by Commerce provides a detailed procedure for

determining whether a particular product falls within the scope of an antidumping or

countervailing duty order.  See 19 C.F.R. § 351.225(k).  These regulations are in place because

"the descriptions of subject merchandise contained in the Department's determinations must be

written in general terms."

---

[17]  This raises the question of whether Commerce created a scope definition that it cannot administer or that is based on end-uses, which would be contrary to Commerce's practices. Commerce stated that during the investigation, no party argued, beyond the broad arguments made here, that any of the identified imports were not within the scope of the investigation or were unsuitable for high quality printing.  Issue and Decision Memorandum at 57.  Thus, the issue of whether a particular product meets the physical definition of the scope but may be non-subject merchandise because it is not suitable for printing has not been presented to Commerce. Commerce's decision to avoid making a determination until the issue is actually presented is reasonable, as a party can establish that its particular product is not covered because it is not suitable for high quality printing..

Id. § 351.225(a).[18]  Here, Commerce noted Plaintiff's arguments relating to the differences in

thickness, stiffness, and reading/recognition between multi-ply and single-ply paperboard and

recommended that the parties develop a record on these issues for use in subsequent scope

inquiries should the issue arise.  Scope Memo at 11; Issue and Decision Memorandum at 56–57.

Thus, Commerce has proposed that it merely follow its existing procedures.[19]

      Although Commerce cannot yet determine whether every multi-ply product

entered into the United States is covered under the scope of the order, Commerce's conclusion

that at least some multi-ply paper is included in the scope and therefore, that all multi-ply paper

should not be excluded, is supported by substantial evidence on the record.

---

[18]  Under these procedures, Commerce must first determine that the language of the final order is subject to interpretation.  See Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1383 (Fed. Cir. 2005).  Commerce then determines whether a particular product is included within the scope of an order by considering: "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."  19 C.F.R. § 351.225(k)(1).  If Commerce finds the above criteria are sufficient to resolve the issue, Commerce issues a scope ruling.  Walgreen Co. of Deerfield, IL v. United States, 620 F.3d 1350, 1352 (Fed. Cir. 2010) (citing 19 C.F.R. § 351.225(d)).  If not, Commerce initiates a scope inquiry to further consider: "(i) The physical characteristics of the product; (ii) The expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The channels of trade in which the product is sold; and (v) The manner in which the product is advertised and displayed."  19 C.F.R. § 351.225(k)(2).

[19]  Pindo Deli argued at oral argument that Commerce should exclude all multi-ply products and add multi-ply products that meet the scope definition through subsequent scope inquiries.  Such a procedure would be contrary to law because Commerce cannot expand the scope of an order through scope inquiries.  See 19 C.F.R. § 351.225(a) ("the Department issues 'scope rulings' that clarify the scope of an order . . . ." (emphasis added)); Ericsson GE Mobile Commc'ns Inc. v. United States, 60 F.3d 778, 782 (Fed. Cir. 1995) (concluding Commerce improperly expanded the scope of an order through a scope ruling).

## II.    Industry Standing

Pindo Deli argues alternatively that if the scope was not improperly expanded,

Commerce's final determination is contrary to law because the Petitioners lack industry

standing. Pl.'s Br. at 3, 29. Defendant argues that Pindo Deli failed to exhaust its administrative

remedies by timely objecting before Commerce and therefore, the argument is not properly

before the court.[20] Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Admin. R. and App. 30–35

("Def.'s Br."); Def.-Intervenors' Opp'n to Mot. for J. on the Agency R. of Pl. PT Pindo Deli

Pulp and Paper Mills 34–35 ("Def.-Ints.' Br."). Pindo Deli argues that its failure to timely object

should be excused because the Petition did not give adequate notice that multi-ply products were

included in the Petition's scope. Pl.'s Br. at 2; Pl.'s Reply to Def.'s and Def.-Ints.' Resp. Brs.

12–13 ("Pl.'s Reply").

Commerce is prohibited from reconsidering industry support after the initiation of

an investigation. See, e.g., 19 U.S.C. § 1673a(c)(4)(E). This limitation however, does not limit

---

[20] Commerce can consider comments relating to industry support within twenty days of the petition being filed. See 19 U.S.C. § 1673a(c)(1), (4)(E) (antidumping investigations); 19 U.S.C. § 1671a(c)(1), (4)(E) (countervailing investigations). Once Commerce initiates an investigation, it cannot reconsider industry support. 19 U.S.C. §§ 1673a(c)(4)(E), 1671a(c)(4)(E); see Uruguay Round Agreements Act ("URAA"), Statement of Administrative Action, H.R. Rep. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4194, 1994 WL 16137731 ("SAA") ("Arguments regarding industry support should not be made to either Commerce or the Commission following initiation."). Here, Pindo Deli first raised its objection to industry support after the initiation of the investigations. See Pl.'s Scope Cmts. at 10–12.
Moreover, before Commerce, Pindo Deli argued that industry support needed to be reexamined because the scope of the investigation had been improperly expanded to include multi-ply products. Pl.'s Scope Cmts. at 10. Commerce noted that it could not reconsider industry support but noted the scope had never been expanded. Scope Memo at 7. Commerce was never presented with the issue of whether the industry support determination was in error if the scope had never been expanded, which is the argument Pindo Deli presents to the court.

the court's ability to review Commerce's industry support determination.  SAA, 1994

U.S.C.C.A.N. at 4194 ("Interested parties will continue to be able to challenge the adequacy of

Commerce's industry support determination" after initiation if a final antidumping duty order is

issued.).  Nor does Plaintiff's failure to exhaust administrative remedies necessarily prevent the

court from reviewing the agency determination.[21]  See 28 U.S.C. § 2637(d) (the court shall

require exhaustion "where appropriate"); Cemex, S.A. v. United States, 133 F.3d 897, 905 (Fed.

Cir. 1998) (holding exhaustion requirement discretionary and not jurisdictional).  Thus, the

question is not whether the court can review Commerce's industry standing determination, but

what evidence the court should consider when conducting its review.  Defendant-Intervenors

argue that the court should limit its consideration to the evidence before the agency at the time of

the agency's decision.  Def.-Ints.' Br. at 31.  It is not disputed that Petitioners have industry

standing based on the evidence before the agency at the time of the Initiation Notice.  Pindo Deli

argues that the court should consider additional evidence presented after initiation that now

---

[21]  Commerce found there was no evidence of intentional gamesmanship by Petitioners to
conceal the fact that multi-ply products were included in the Petition's scope.  Issue and
Decision Memorandum at 59.  Even without intentional misconduct, the parties agreed at oral
argument that a petition may fail to give sufficient notice, which may excuse the failure to object
to industry standing before initiation of the investigation.

demonstrates that Petitioners lack industry standing.[22]  Pl.'s Br. at 33–34.  The court concludes

Pindo Deli's failure to submit its objections to industry support before the <u>Initiation Notice</u>

cannot be excused for lack of notice and that even if the court were to consider Plaintiff's

additional evidence, it fails to warrant a remand.

> **A.      Notice**

Pindo Deli argued at oral argument that the Petition did not give adequate notice

that multi-ply products were included in the scope for two reasons, and its belated objection to

standing should be excused by the court.  First, while the Petitioners included most of the

subheadings under HTSUS heading 4810, they excluded HTSUS classification 4810.92, which

Pindo Deli argues is the proper classification for multi-ply products.  <u>See</u> Pl.'s Br. at 19 n.3.

Second, according to Pindo Deli, a previous 2006 petition submitted by the same Petitioners

explicitly included multi-ply products, while the current Petition did not, giving Pindo Deli the

---

[22]  On the one hand, it seems unlikely that Commerce, on its own, may reopen the record and conduct a new industry support determination.  <u>See</u> 19 U.S.C. § 1673a(c)(4)(E) (after initiation, industry support shall not be reconsidered); SAA, 1994 U.S.C.C.A.N. at 4192 ("the question of industry support will be resolved conclusively at the outset of a proceeding . . . .").  If parties only had to wait until after a final order was issued to challenge industry support, parties would likely continue to supplement the agency record with evidence relating to industry support in order to preserve the evidence for judicial review, essentially continuing the prolonged litigation at the agency level that the URAA intended to curtail.  <u>See</u> <u>id.</u> at 4192 (noting the change eliminated "the burden on petitioners under current law of potentially rearguing this issue after initiation").  On the other hand, the court has, at least once, remanded to Commerce to reconsider an industry support determination and to reopen the record.  <u>See</u> <u>Save Domestic Oil, Inc. v. United States</u>, 24 CIT 994, 1015, 116 F. Supp. 2d. 1324, 1343 (2000) (holding Commerce's dismissal of a petition for lack of industry support not supported by the record and remanding for reconsideration and initiation of an investigation).  Although it also seems likely that the court may order reopening based on agency error, as Plaintiff had adequate notice and has not presented evidence sufficient to warrant a remand, the court does not resolve this issue.

impression that multi-ply products were excluded from the current Petition.[23]

Before the International Trade Commission, Pindo Deli stated that its "multi-ply board" from Indonesia was coming in under the relevant HTSUS classifications, but that they "should have come in under 481092." Pet'rs' Scope Cmts. at Ex. 2, 150. Thus, at the time of the Petition and the Initiation Notice, it appears at least some of Pindo Deli's multi-ply products were entering the United States under HTSUS classifications other than 4810.92. Only after the Initiation Notice did Pindo Deli argue that 4810.92 was the only proper category for its multi-ply products. Pindo Deli cannot claim a lack of notice that some of its multi-ply products would be subject to the Petition's scope when the Petitioners named Pindo Deli as a foreign producer of subject imports and some of Pindo Deli's multi-ply products were, at that time, entering under the "relevant HTS[US] classifications" contained in the Petition. Pet'rs' Scope Cmts. at Ex. 2, 150. Pindo Deli's subsequent discovery that 4810.92 is the proper classification for all of its products does not defeat the Petition's notice.

Moreover, Pindo Deli has not established that, at the time of the Petition, there was a clear practice of classifying all multi-ply products under 4810.92 so that the exclusion of 4810.92 could imply that multi-ply products would not be included in the scope. In support of its argument, Pindo Deli relies on a customs classification ruling that concluded the proper

---

[23] Plaintiff did not make this argument in its brief. Moreover, there is no evidence on the record to support the allegation that the 2006 petition expressly included multi-ply products. Plaintiff relied on the notice of initiation for the 2006 investigation, but in that notice, Commerce's description of the scope does not mention the number of plies as a relevant characteristic. See Initiation of Antidumping Duty Investigations: Coated Free Sheet Paper from Indonesia, the People's Republic of China, and the Republic of Korea, 71 Fed. Reg. 68,537, 68,538 (Dep't Commerce Nov. 27, 2006).

classification for a similar multi-ply product was 4810.92. Pl.'s Br. at 19 n.3 (citing NYRL

N101355, 2010 U.S. Custom. NY Lexis 1518 (May 14, 2010)). This customs ruling cannot

support Pindo Deli's argument because it was issued in May 2010, almost nine months after the

Petition and therefore, cannot demonstrate an established practice as of 2009 or have influenced

Pindo Deli's belief that the Petition did not include multi-ply paper.[24]

       Pindo Deli also relies on its assertion that certain Chinese and Indonesian

companies had been importing significant amounts of multi-ply products for packaging

applications under 4810.92 for years prior to the Petition. Pl.'s Br. at 18–19. These entries do

not establish a practice of classifying all multi-ply products under 4810.92 because although

4810.92 is likely the correct classification for some multi-ply goods, it is not the exclusive

classification for all multi-ply products. See, e.g., NYRL B80872, 1997 U.S. Custom. NY Lexis

330 (Jan. 16, 1997) (classifying multi-ply paperboard for packaging applications under

4810.39.2000). Subheading 4810.92 does not automatically apply to all multi-ply products.

Instead, only those multi-ply products that are not "of a kind used for writing, printing or other

---

[24] The conclusion of the Customs ruling cited by Plaintiff is in conflict with a
memorandum placed on the record by Defendants, which summarizes a Custom official's
description of the HTSUS classification rules as they apply to multi-ply CCP and concluded
classifications 4810.00–4810.29 are more appropriate than classification 4810.92. Phone Call
Regarding Scope/HTS Classification Questions, Def.'s Confidential App. Tab 10, at 1. Based on
these conflicting determinations, Commerce found that the classification of multi-ply CCP was
"complicated" and the proper classification was "not obvious." Issue and Decision
Memorandum at 55.

graphic purposes."[25] There is also no evidence to show the historical entries are subject

merchandise. The Petitioners' exclusion of a classification that applies to non-subject

merchandise is not relevant to whether in-scope multi-ply products will be subject to the

investigation. Pindo Deli's historic practice of classifying some products under 4810.92 thus

does not establish a historic practice of using that classification for all multi-ply goods. As a

result, the exclusion of 4810.92 from the Petition does not speak to whether multi-ply products

were to be included in the scope. Instead, the Petitioners likely excluded 4810.92 because paper

not "of a kind used for writing, printing or other graphic purposes" is likely not suitable for high-

quality print graphics and therefore, is outside the scope of the Petition. In fact, the Petition

excluded all subheadings applicable to paper not "of a kind used for writing, printing or other

graphic purposes" including classification 4810.92 (multi-ply paper) and 4810.99 (single-ply

---

[25] Here, it is not disputed that 4810 is the proper heading. Once a HTSUS heading is
determined, the General Rules of Interpretation ("GRIs") are to be re-applied to determine the
classification of goods at the subheading level. GRI 1, 6; Orlando Food Corp. v. United States,
140 F.3d 1437, 1440 (Fed. Cir. 1998). The GRIs are applied to the subheading level "on the
understanding that only subheadings at the same level are comparable." GRI 6. Here, the first
level of subheadings to be compared include: "Paper and paperboard of a kind used for writing,
printing or other graphic purposes, [and is not CFS paper]" and "Other paper and paperboard."
See HTSUS 4810.22, 4810.92 (2009). This "Other paper and paperboard" category should be
selected only if the other subheadings are not applicable. See GRI 3(a) ("The heading which
provides the most specific description shall be preferred to headings providing a more general
description."); BASF Corp. v. United States, 482 F.3d 1324, 1326 (Fed. Cir. 2007). Here, only if
the paper is not used for "writing, printing or other graphic purpose" does it fall under the "Other
paper and paperboard" category.
     Once a subheading level is selected, the process is repeated at the second sub-heading
level. Only at this second subheading level does multi-ply become a relevant characteristic.
Thus, in order to conclude that these historic entries were classified under 4810.92 because they
are multi-ply, the court must ignore the first level of subheadings, which is not permitted under
the GRIs, or assume that all multi-ply paper is not "of a kind used for printing, writing, or other
graphic purposes," which is not supported by the record.

paper).

Even if this interpretation of the HTSUS classification system is incorrect (the issue has not been placed squarely before the court), the uncertainty in determining the proper classification experienced by the parties, Commerce, and Customs strongly suggests that the classification of goods under 4810.92 was not so established as to justify Pindo Deli's assumption that the exclusion of 4810.92 signaled the exclusion of all multi-ply products. Thus, Pindo Deli has not demonstrated that the Petition did not give notice that multi-ply products that otherwise meet the scope parameters would be included in the investigation and there is no valid reason for excusing Pindo Deli's failure to present its objections to industry standing prior to the Initiation Notice.

**B.     Excluded U.S. Producers**

Even if the court were to consider Pindo Deli's evidence presented after the Initiation Notice, such evidence does not cast doubt on Petitioners' standing sufficient to warrant a remand.[26] According to Pindo Deli, concluding multi-ply products were always within the scope of the Petition is tantamount to acknowledging that Commerce, in its industry standing

---

[26] Although not in relation to industry standing, Commerce did consider Plaintiff's evidence relating to the excluded U.S. producers of CCP products when considering whether to delete the phrase "suitable for high quality print graphics" from the scope definition. Scope Memo at 10 n.39. Commerce concluded that the evidence on the record, including the evidence submitted after initiation, "does not indicate that the producers identified by Respondents as package paper producers are significant producers of paper that Petitioners intended to be covered by these investigations." Id. To the extent this finding can be applied to a determination on industry standing, Commerce has already considered Plaintiff's evidence and made a finding that such evidence does not demonstrate a significant amount of domestic CCP production was excluded. Because Commerce's finding is not directly on point, the court will consider Plaintiff's evidence.

analysis, failed to consider certain U.S. producers of multi-ply paperboard. Pl.'s Br. at 34.

Defendant argues there is no evidence on the record to show significant volumes of domestically

produced multi-ply CCP were excluded. Def.'s Br. at 35. Plaintiff argues whether these

producers produce a like-product in significant numbers is for Commerce to decide and these

producer's overall revenues suggests that their production is not insignificant. Pl.'s Br. at 34;

Pl.'s Reply at 5–6.

        Plaintiff's evidence submitted after initiation shows that three U.S. companies,

International Paper, Georgia-Pacific, and MeadWestVaco each produce at least one CCP product

(i.e. meets the physical description, sold in sheets, and is suitable for printing). See Pl.'s Reply

at 14. Specifically, Geogia-Pacific's MasterPrint and MasterPrint II, MeadWestVaco's Tango

Advantage C1S, and International Paper's Everest and Fortress paper are, at least in part, CCP

products.[27] See Pl.'s Add. Scope Cmts. at Attach. 2–3 (providing physical description and

suitability); Pet'rs' Questionnaire Resp. at 6, 8–9 (confirming products available in sheets). For

argument's sake, the court will assume the Coated Paper Products Survey ("CPP Survey") used

by Petitioners and Commerce to estimate U.S. production of CPP did not capture the production

---

[27] MasterPrint and MasterPrint II products range in weight from 234 to 440 grams per square meter ("gsm"). See Pl.'s Add. Scope Cmts. at Attach. 2. Only that portion under 340 gsm would be subject merchandise. Although Everest products are advertized as designed for "[p]rinting [a]pplications," Pl.'s Req. to Re-examine the Dep't's Industry Supp. Calculation at Attachs., there is no evidence showing Fortress products are suitable for printing or high quality print graphics. Additionally, the record shows that only a portion of Everest and Fortress products are produced in sheets. See Pet'rs' Questionnaire Resp. at 8.

of the CCP products noted above.[28]  With this assumption, Plaintiff has shown that the industry

data used to calculate industry support did not capture the entire domestic industry.  Whether this

also shows that Commerce's resulting industry standing determination was in error depends on

the magnitude of the error in the industry data and whether data exists to demonstrate that error

to Commerce.  The record currently cannot answer these questions because Plaintiff has

presented only overall revenues of the excluded U.S. producers, which say nothing about the

production levels of the CCP products.[29]

      The fact that the industry data is not perfect is not sufficient to suggest that

Petitioners do not have industry standing.  Industry standing calculations are not meant to be

exact and proxies are routinely used to estimate the amount of U.S. production of a particular

product.  See 19 U.S.C. § 1673a(b)(1) (requiring the petition to contain information on the

domestic industry "reasonably available" to petitioners).  Thus, Plaintiff must do more than point

---

[28]  The CPP Survey was developed by the American Forest and Paper Association, which aggregated data from the "coated paper" industry, including CFS and mechanical paper, and did not distinguish between multi-ply and single ply paper.  See Petition at Todasco Ex. A.  The record does not reflect whether the CPP Survey captured the production of these excluded producers.  If the excluded production is mechanical paper, then the industry data is incorrect by stating that all the mechanical paper produced in the United States for 2008 was in rolls and not sheets.  The production of the excluded producers may also not have been included in the CPP Survey because the CFS and paper for packaging applications industries are generally distinct in the United States.  See Scope Memo at 10 n.39.

[29]  If the record were reopened upon remand, it is possible that a party could submit information demonstrating that the calculation of industry standing was in error.  It is also possible that Petitioners would submit evidence showing that these excluded U.S. producers are represented by USW and therefore, can be considered to support the Petition.  See 19 C.F.R. § 351.203(e)(3).  Even if Commerce were eventually to conclude that Petitioners lacked industry standing, Commerce could disregard the industry support calculation altogether and self-initiate a petition.  19 U.S.C. § 1673a(a).  The court will not assume that Plaintiff's scenario is the most likely outcome and will not rely on such speculation as grounds for a remand.

out that the industry data was not perfect in order to show Petitioners lack industry standing.

Plaintiff has not presented any evidence to show that there is a more accurate and available

source of information that could alter Commerce's determination.  Moreover, Commerce did not

rely solely on the CPP Survey data but also considered "supplemental submissions, and other

information readily available to the Department" and concluded the totality of this information

"indicates that Petitioners have established industry support." <u>Initiation Notice</u>, 74 Fed. Reg. at

53,712.  In sum, although Plaintiff has presented evidence that Commerce may have partially

relied on industry data that was not a perfect proxy for the U.S. CCP industry, Plaintiff has not

presented evidence to suggest the error was so great as to defeat Petitioners' standing, or that

such evidence exists and could be submitted to Commerce on remand.  Thus, Plaintiff's request

for a remand is denied.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the agency record is

DENIED and the determination of Commerce is SUSTAINED in its entirety.


                                                    <u>  /s/ Jane A. Restani  </u>
                                                         Jane A. Restani
                                                              Judge


Dated this 16th day of March, 2012.
New York, New York.

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PT PINDO DELI PULP and PAPER MILLS,** | |
| Plaintiff, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Court No. 10-00369** |
| Defendant, | |
| and | |
| **APPLETON COATED LLC, NEWPAGE CORPORATION, S.D. WARREN COMPANY d/b/a SAPPI FINE PAPER NORTH AMERICA, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,** | |
| Intervenor Defendants. | |

## <u>JUDGMENT</u>

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; Now therefore, in conformity with said decision, it is hereby

**ORDERED** that Plaintiff PT Pindo Deli and Paper Mills' motion for judgment on the agency record is denied and the challenged determination of Commerce is **SUSTAINED**.

    /s/ Jane A. Restani    
Jane A. Restani
Judge

Dated this 16th day of March, 2012.
New York, New York.